# Marie Ignozzi

| | |
|---|---|
| **From:** | Greg Foertsch <gfoertsch@gmail.com> |
| **Sent:** | Tuesday, May 3, 2022 6:32 PM |
| **To:** | Paul Evelius |
| **Cc:** | Alison Kelly |
| **Subject:** | Re: Call Today With TW's Lawyers |

Hey Paul,

My thoughts are in green.

Maybe I am oversimplifying but here is my take on the bottom line:

- **Tom decided to quit prior to us finishing negotiations**
- **The focus of this conversation is *still* that Tom willfully violated his NDA with Bit Reactor and EA by sending proprietary information to his personal email after having submitted his resignation.**
- **Additionally, he deliberately to steps to permanently delete his sent and deleted emails form his Bit Reactor email account from 2/18/2022 – 3/14/2022**
- **Given that information I would like written confirmation that this info has been deleted and any other proprietary content in Tom's possession has been disclosed and deleted as well.**
- **I also doubt that Tom has been honest with his council on any of these points**

1. Making sure that TW gets paid his accrued PTO.
   - **TW was paid for 3 weeks past his last scheduled day of 3/18/22 which covers not only his PTO accrual, but we also contributed to his 401K while we waited for him to respond, which he never did.**
2. The fact that the offered severance pay appears to be two months of salary, which he views as insufficient.
   - **Again, this is incorrect. We offered him 3 months of severance plus his PTO. Which he never responded to or engaged with us on.**
3. The absence of any proposed payment for TW's (alleged) 1/3 interest in BR.
   - **It was made very clear to Tom that 1/3 interest was contingent on him signing his employment contract and that an operating agreement would follow. An employment contract was presented to me, Alison, and Tom in May of 2021 with a separate job description for each of us.**
   - **In June on 2021 Tom returned the Employment contract marked up with the first line saying that "his attorney advised him not to sign it"**
   - **The mark up also went on to include concessions that Tom knew we could not make without violating our publishing contract with Electronic Arts. For example, he wanted to:**
     - **own his work product - EA/Lucas Film owns our work product through Bit Reactor**
     - **have the ability to do work on the side and sell it – we are not allowed to compete or moonlight**
     - **Be removed from liability or indemnification – we are not even afforded this in our publishing contract, and it was one of the largest negotiation points**
   - **In good faith Bit Reactor paid his exorbitant attorney fees ($7500) he incurred to review his employment agreement and the operating agreement while we were trying to sort out the motivations on Tom's end.**
   - **In the beginning of 2022 as things got a little less busy, I re-engaged both Tom and Alison to review their job descriptions, so that we could move forward with the employment contracts. Tom agreed that his description was accurate.**

1

- **I mentioned multiple times between December 2021 and February 2022 that I need Tom to fulfill several parts of the job description:**
  - **Planning for growth by creating technical documentation**
  - **Help with staffing**
  - **Programming**
  - **Better management of his team**
- **Tom agreed on February 7th to deliver a technical document on February 18th and then failed to deliver it. We gave him an additional week and again he failed to produce a usable document. We discussed that this wasn't acceptable and that he needed to deliver documentation so we could accurately plan. We left the conversation clearly stating that we should discuss the subject more on Monday.**
- **No one forced Tom out or even suggested anything of the sort.**
- **Tom returned to work on Monday February 28th and notified us of his intention to resign.**
- **The bottom line is that Tom opted to leave while we were still negotiating his employment contract and the operating agreement.**

He asked that I send him a WORD version of the severance agreement so that he can make proposed changes and we could negotiate from there. He said he doesn't think a big fight is in anybody's best interest and I said I generally agreed.
- **This is fine to send**

I told him that BR has paid the accrued PTO. (He didn't respond specifically to that.) Also I figured I'd go ahead and try to smoke him out on why TW thinks he owns a 1/3 interest and, when I asked, EG responded by saying/alleging that:

- TW formed the company with the other founders
- That TW stayed involved only because he was told he'd get such an interest, that he'd told you that he didn't want to be involved without an interest and that he'd "stay" only if he got an interest, and that he relied on the promise that he'd have an interest
- **Is this ultimatum written somewhere?**
- That TW had been involved "all along the way"
- **Tom was along for the ride, but the involvement is debatable**
- That there's obviously been success in reaching a deal with AE and that he'd been named as a key person in the AE agreement
- **What is the proof of this? He never made a pitch or created a single piece of documentation that was required for the deal.**
- That TW had worked nights and weekends and participated in the company's ramp up
- **He has been fully compensated the same as everyone else to this point**
- That the development of the company supports TW's position that he owns an interest

**Some points worth noting:**
- **Tom went for several months without performing his primary responsibility to write code and only came clean about when confronted. At that point he said he had no interest in programming (Oct 2021)**
- **Tom had 2 of 4 direct reports offer their resignations due to Tom's in ability to be an effective manager – again part of his basic job requirements**
- **Tom violated our NDA by telling one of his industry friends about difficulties we were having working out the story for our game with Lucas Film**
- **Tom again violated our NDA with EA by telling our employees information about our hiring ramp that is a part of our publishing contract (which we are not supposed to discuss the details of and is clearly stated in his NDA with Bit Reactor and EA) – Best of all the information was factually incorrect**
- **Tom offered me $100k spread over 4 years as compensation for my work (ideas and pitch deck) that went into us getting a publishing deal. This is in writing and was not offered to anyone but me.**
- **Tom has since used his knowledge gained as a manager here to tamper with and hire an employee, Scott Ramsay**

On Fri, Apr 29, 2022 at 10:13 PM Paul Evelius <pevelius@wcslaw.com> wrote:

> Hi Greg, Alison—
>
> Sorry this comes late in the evening, but it's been a hectic day. Anyway, I spoke today with Ezra Gollogly (EG) and Joe Dudek, the two lawyers at Kramon & Graham who are representing TW.
>
> EG did all the talking on their side. He started by saying that his concerns relative to the proposed severance agreement are:
>
> 1. Making sure that TW gets paid his accrued PTO.
>
> 2. The fact that the offered severance pay appears to be two months of salary, which he views as insufficient.
>
> 3. The absence of any proposed payment for TW's (alleged) 1/3 interest in BR.
>
> He asked that I send him a WORD version of the severance agreement so that he can make proposed changes and we could negotiate from there. He said he doesn't think a big fight is in anybody's best interest and I said I generally agreed.
>
> I told him that BR has paid the accrued PTO. (He didn't respond specifically to that.) Also I figured I'd go ahead and try to smoke him out on why TW thinks he owns a 1/3 interest and, when I asked, EG responded by saying/alleging that:
>
> - TW formed the company with the other founders
>
> - That TW stayed involved only because he was told he'd get such an interest, that he'd told you that he didn't want to be involved without an interest and that he'd "stay" only if he got an interest, and that he relied on the promise that he'd have an interest
>
> - That TW had been involved "all along the way"
>
> - That there's obviously been success in reaching a deal with AE and that he'd been named as a key person in the AE agreement

- That TW had worked nights and weekends and participated in the company's ramp up

- That the development of the company supports TW's position that he owns an interest

I chose not to respond substantively to those statements because I knew I wasn't going to persuade him that TW is wrong and I didn't want to give anything away about our position at this point.

I told him that I have no problem with sending him a Word version of the draft severance agreement so that he could make proposed revisions, but that I wanted to get BR's authorization first.

So that's where it ended. Please let me know if you're ok with me sending EG the Word version. As a practical matter, I think doing so will at least get us on the road to negotiating a resolution.

All that said, I think we should strategize about our position as to TW's ownership-interest claim. Among other things, even if he did participate substantially, he also left before complete fruition. Please let me know when you're available to talk in that regard.

Thanks.

Paul



**Paul F. Evelius**
Wright, Constable & Skeen, LLP

7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
Tele: 410-659-1302 Fax: 410-659-1350
Cell: 443-762-1015
E-mail: pevelius@wcslaw.com
www.wcslaw.com

Confidentiality Disclaimer

This message may contain privileged or confidential information that is protected from disclosure.  If you are not the intended rec
this message, you may not disseminate, distribute or copy it.  If you have received this message in error, please delete it and not
sender immediately by reply email or by calling 410-659-1300.

IRS Disclaimer

IRS rules restrict written federal tax advice from lawyers and accountants. We include this statement in all outbound emails beca
inadvertent violations may be penalized. Nothing in this message is intended to be used, or may be used, to avoid any penalty u
federal tax laws. This message was not written to support the promotion or marketing of any transaction. Contact the sender if yo
engage us to provide formal written advice as to tax issues.