LAW OFFICES
**KRAMON & GRAHAM, P.A.**
ONE SOUTH STREET
SUITE 2600
BALTIMORE, MARYLAND 21202-3201
TELEPHONE: (410) 752-6030
FACSIMILE: (410) 539-1269
www.kramonandgraham.com

EZRA S. GOLLOGLY
ADMITTED IN MD

E-MAIL
egollogly@kg-law.com
DIRECT FACSIMILE
(410) 361-8233

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO MD. RULE 5-408**

July 8, 2022

**BY E-MAIL** (pevelius@wcslaw.com)

Paul F. Evelius, Esq.
Wright, Constable & Skeen, LLP
7 St. Paul St., 18th Floor
Baltimore, Maryland 21202

    Re:    Thomas Whittaker/Bit Reactor, LLC

Dear Paul:

As you know, this firm represents Tom Whittaker in connection with his separation from Bit Reactor.[1] Per our discussions on May 26 and June 3, this letter sets out the basis of Mr. Whittaker's one-third ownership interest in Bit Reactor—an interest he is unwilling to disclaim without fair compensation.[2]

**I.    Background**

Tom began working with Greg Foertch and Alison Kelly on the Bit Reactor project in late 2019. At the time, Tom had a full-time job at Mohawk Games and Greg (laid off from a previous full-time role) was working on a contract basis for Romero Games. From roughly January 2020 to January 2021, Tom, Greg, Alison, and (for a while) Steve Meyer worked together, mostly late at night and on weekends, to develop their concept for a game and construct pitches targeted to possible investors.

---

[1] On April 22, we also sent you a letter addressing your claim that Mr. Whittaker had violated the Computer Fraud and Abuse Act by sending documents and information to his personal Gmail account—an account that Bit Reactor's CEO was then *still using* to send information to Tom. There is zero basis for the asserted claim, and I trust that our letter and our subsequent conversations have resolved that issue.

[2] In our proposed severance agreement revisions, we wrote: "We calculate Mr. Whitakker's accrued [Personal Time Off or PTO] as 133.33 hours or $12,820. We have subtracted $3,136.41 paid on April 8." Please confirm that Bit Reactor will immediately pay Mr. Whittaker the resulting $9,683.59, which represents his fair compensation for accrued PTO.

In January 2020, the group's prospects of making this work their full-time job improved dramatically with their pitch to executives at Electronic Arts. EA executives were exploring the idea of a roughly $3 million bridge loan to get things started, and the prospects of a large funding agreement were good. But EA naturally wanted to contract with a company, not just a collection of aspiring developers. Consequently, discussions intensified among Greg, Tom, Alison, and Steve about the organization and structure of the company. Greg insisted on an outsized ownership share and authoritative role in the company, prompting Steve to abandon the project altogether shortly before March 2, 2021. That decision weighed heavily on Tom, who wrote on March 2 to Greg and Alison:

> After processing last night, I'm not comfortable going forward without Steve. . . . For me it's always been about the team and product. . . . All I want is a healthy company with a strong foundation. One where I feel confident recruiting friends and colleagues. That means dealing with as little of the business as possible and concentrating on the team, product, and creativity. An ownership agreement where you [Greg] essentially have ultimate say over most decisions doesn't work for me (2x voting, 2x ownership, 66.7%, and Managing Partner). I understand why that wouldn't work for Steve. We have to delegate and trust in each other.
>
> When I suggested we talk about forming the company, I offered a "suggestion of terms" as a starting point. I emphatically said we should as a group discuss and form this company together. I suggested operating terms that limited Steve's control and required voting on key issues as a team, plus putting you as the face of the company. Terms that work for all of us, the team and the company. Instead, you got advice from others without involving us. I am only comfortable with an equal partnership (equal voting and decision making). The voting is a problem with four votes but there are solutions for that.

Tom made clear that he would walk away from a company unless it had an equal ownership structure.

Even so, Greg sent a draft operating agreement on March 13 that contemplated a 50/25/25 ownership split for Greg, Tom, and Alison, with Greg still effectively at the helm. On March 15, Tom announced that he too was walking away from the project: "As the company is structured, I don't believe we can fulfill the contract. I'm letting the team know that I will no longer be associated with BitReactor's ongoing efforts. Good luck with the project." And when Greg asked for "a chat," Tom declined:

> There is not much to discuss other than what I said on March 2nd. You've decided to make this your company, the operating agreement terms aren't conducive to a viable company. The management of the company is setup more for control than operations. To be honest you have no experience running a business and you want to be Creative Director, CEO, Management Partner, External contact for all correspondence. . . . That doesn't seem like a company based on trust but on control.

Two days later on March 17, Greg, Tom, and Alison met on Google Meet to iron out their differences. During that meeting, Greg agreed to equal ownership in the company if Tom would come back. In exchange, Greg asked Tom to execute the Bit Reactor Nondisclosure Agreement and rejoin the group's efforts. Tom was reluctant to return, because Greg's efforts throughout March to take control of the company were disconcerting. Greg encouraged him to think about it.

Tom slept on it and, the next day, agreed to the equal ownership structure the three founders had discussed the day before. Tom executed and returned the nondisclosure agreement via the group's Slack chat. Greg was thrilled; he reacted to the chat message almost immediately with text emojis and emoticons. And rightly so; over the next few months, Greg and Tom would be named as key development personnel and key employees under the EA funding agreement that would give Bit Reactor $50 million for game development.

Tom then quit his job in mid-June of 2021—even before Greg did—to start working full-time on the Bit Reactor project. Tom committed fully to a risky start-up, abandoning a steady job and even declining another job offer. He brought in his own computers and network equipment to get Bit Reactor operational before it could buy its own equipment. But once the business really got going, everyone's attention turned away from formalizing their agreement regarding ownership and toward delivering a great game.

In sum, Tom walked away from any version of Bit Reactor that did not include equal ownership among Greg, Tom, and Alison. He rejoined and committed to full-time work for Bit Reactor only after he and the other founders agreed to an equal ownership structure. All along, his commitment to equal ownership was more than just economic; he believed that equal ownership was the only effective way to run a successful company.

## II.     Discussion

Tom's position is simple: Greg, Alison, and Tom agreed on equal one-third ownership interests in Bit Reactor. That formed a contract under black-letter contract law. *Cochran v. Norkunas*, 398 Md. 1, 23 (2007) ("Creation of a contract requires an offer by one party and acceptance by the other party.") It did not need to be reduced to writing to be binding and enforceable.[3]

---

[3] No provision of the Maryland statutes of frauds require that this contract be written to be enforceable. The contract is not for the sale of goods worth over $500; made in consideration of marriage; for the sale for interest in land; for a long-term lease of land; a service contract that requires performance for more than one year; an executor's pledge to pay off an estate's debts with personal funds; or a suretyship. *See generally* Md. Code Ann., Real Prop. §§ 5-101 *et seq.*; Md. Code Ann., Cts. & Jud. Proc. § 5-901; *Home News, Inc. v. Goodman*, 182 Md. 585 (1944) (because employment may be completed or terminated within one year, an oral employment contract is not barred by the statute of frauds). Greg could have fully performed immediately. *See G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1078, 1082 (D. Md. 1989) (a terminable agreement to become an employee does not trigger the statute of frauds).

Contract acceptance is affirmed by the parties' performance, since "[a]cceptance may be manifested by acts as well as words." *Id*. Tom sent Greg and Alison a signed nondisclosure agreement, which everyone understood was his agreement to equal ownership interests. And Tom's subsequent work for Bit Reactor only reinforces his acceptance—he helped secure an enormous development and publishing agreement with Electronic Arts, Inc. ("EA"). EA named him as "Key Development Personnel" and a "Key Employee" in the agreement, requiring that he commit "no less than . . . 100% of [his] work time" to the EA-funded project. *Development and Publishing Agreement* § 2.9a. Indeed, Bit Reactor cannot replace Tom on the project except with "another equally qualified employee" chosen based on "good faith consultation with EA." *Id*. § 2.9b.

As you noted on our June 3 call, Tom's agreement can form a contract only if there was a "meeting of the minds" as between Greg, Tom, and Alison establishing the core material terms of their contract. *See Creel v. Lilly*, 354 Md. 77, 101 (1999) ("to establish a contract the minds of the parties must be in agreement as to its terms"). Under this test, Maryland courts have found no contract when, for example, the contracting parties never agreed on "a certain price for a certain quantity of goods." *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 163 (1996). But here, all of the material terms related to Tom's hiring were set out clearly—an equal ownership share in the resulting company in exchange for Tom's signing on as its Chief Technology Officer. These terms are set out in contemporaneous Slack chats, which document the content of video calls and other communications.

It is irrelevant to the meeting-of-the-minds analysis that Greg, Tom, and Alison failed to formalize some of the remaining terms of Bit Reactor, LLC's operating agreement, or that they deferred resolving those terms while focusing on other business tasks. That agreement was designed merely to commemorate an agreement they had already made with one another. Many of the remaining terms were immaterial to the core contract among them—no matter how an LLC member "mak[es] an election for the Company to be treated as a corporation for federal or . . . state or local income tax purposes," Operating Agreement Draft § 5.2.6., or who serves as Bit Reactor's resident agent, *id*. § 2.6, the material terms of Greg's and Alison's agreement with Tom remained the same—an equal interest in the company. That is why *every* subsequent draft operating agreement recited this ownership interest—the agreed ownership was never at issue.

Indeed, even without an LLC operating agreement, Tom is an equal owner in his joint enterprise with Greg and Alison. The collaborative effort among Greg, Tom, and Alison to work together in furtherance of a joint business purpose formed a partnership, making them equal owners: Md. Code Ann., Corps. & Assocs. § 9A-202 ("[T]he unincorporated association of two or more persons to carry on as co-owners a business for profit forms a partnership."); *id*. § 9A-401(b) ("Each partner is entitled to an *equal share* of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits" (emphasis added)). Thus, even if Tom never acquired an equal ownership interest in Bit Reactor LLC, he remains an equal owner of property acquired in furtherance of his partnership with Greg and Alison, including the LLC itself. *Id*. § 9A-204.

  Under any framing, Tom has an enforceable right to equal ownership of Bit Reactor, LLC. Greg agreed to equal ownership interest in Bit Reactor to keep Tom from leaving. Tom returned to the company only after everyone agreed to equal ownership. That agreement is a legally binding promise—a contract.

  Greg, Alison, and Bit Reactor thus have a choice: They can treat Tom as a co-owner, fairly compensating him for his agreed interest in the company, or they can renege on their promise and force him to vindicate his interest in court. We hope you will agree that litigating this straightforward claim is not a good use of Tom's, Bit Reactor's, or EA's money.

  We look forward to hearing from you regarding the matters addressed above, including the $9,683.59 that Bit Reactor owes Tom for accrued PTO.

            Yours truly,

            /s/ Ezra S. Gollogly

            Ezra S. Gollogly

cc:  Joseph Dudek