Civil Action No. 1:24-CV-02161-JKB

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

ALISON KELLY

Plaintiff

v.

GREGORY FOERTSCH, et al.

Defendants

MEMORANDUM OF DEFENDANTS IN OPPOSITION TO PLAINTIFF'S
MOTION TO DISQUALIFY PAUL EVELIUS AND WRIGHT, CONSTABLE &
SKEEN, LLP AS DEFENSE COUNSEL

Respectfully Submitted,

Paul F. Evelius (Bar #05754)
Wright, Constable & Skeen, LLP
1 Olympic Place, Suite 800
Towson, Maryland 21204
(410) 659-1302 - Telephone
(410) 659-1350 - Facsimile
pevelius@wcslaw.com

*Attorney for Defendants*
*Bit Reactor, LLC and Gregory Foertsch*

1

## INTRODUCTION

Plaintiff Kelly ("**Kelly**") has filed a Motion to Disqualify Paul Evelius ("**Evelius**") and Wright, Constable & Skeen, L.L.P. ("**WCS**," and Evelius and WCS collectively, "**Defense Counsel**") as defense counsel (said Motion, the "**Motion To Disqualify**"), as well as a supporting memorandum (the "**Kelly DQ Memorandum**"). Kelly argues that Defense Counsel should be disqualified (i) based on Rule 19-301.7 of the Maryland Rules of Professional Conduct (said Rules collectively, the "**MRPC**") because, according to Kelly, they allegedly represented Kelly in a prior matter relating to Bit Reactor and (ii) based on MRPC Rule 19.303.7, according to Kelly, Evelius is a necessary witness in this action.

Kelly is incorrect and the Motion to Disqualify should be denied. Kelly has neither proven that Defense Counsel have ever represented her nor proven that Evelius is a necessary witness.

## STATEMENT OF FACTS

In approximately February 2021, Gregory Foertsch ("**Foertsch**") retained WCS and Evelius to provide representation relating to Bit Reactor, an entity which Mr. Foertsch had formed in January 2021 Bit Reactor. Exhibit 1 (Affidavit of Evelius) ¶ 2. On April 27, 2021, Evelius sent Foertch a draft Bit Reactor Operating Agreement which he had prepared at Foertsch's request. (the "**Draft Operating Agreement**"). *Id.* ¶ 3. Evelius' purpose in drafting the Draft Operating Agreement was to prepare an operating agreement under which Kelly and Thomas Whitaker ("**Whitaker**") would, once the agreement was signed by all parties, be members of Bit Reactor. *Id.*

On May 1, 2021, Evelius sent Foertsch a draft employment agreement (the "**Draft Employment Agreement**") which he had prepared at Foertsch's request. *Id.* ¶ 4.

2

In preparing the Draft Operating Agreement and the Draft Employment Agreement, Evelius was acting as counsel for Bit Reactor and Foertsch, but not as counsel for Ms. Kelly or Mr. Whittaker. *Id.* ¶ 5.

On April 27, 2021, Foertsch sent the draft operating agreement to Whitaker and Kelly. *Id.* ¶ 6. In that email, Foertsch states: "Attached is the Operating Agreement Draft. Let me know what you think once your attorney's [sic, attorneys] have looked [it] over. Ignore the typos for now." *Id.* Foertsch also sent the Draft Employment Agreement to Ms. Kelly. *Id.* ¶ 7.

Neither the Draft Operating Agreement nor any other written Bit Reactor multi-party operating agreement has ever been finalized or signed by Kelly or Whittaker. *Id.* ¶ 8. Bit Reactor and Whittaker never entered into the Draft Employment Agreement or any other written employment agreement. *Id.* Bit Reactor and Kelly have never entered into an employment agreement or any other written employment agreement. *Id.*

Bit Reactor, however, has employed Kelly as its Chief Operating Officer from 2021 until the present. *Id.* ¶ 9. Bit Reactor employed Whitaker from 2021 until early 2022. *Id.*

In late February 2022, Foertsch asked Evelius to provide legal assistance regarding the employment relationship between Bit Reactor and Whittaker. *Id.* ¶ 10. That request triggered numerous communications between, on the one hand, Foertsch and/or Kelly, and, on the other hand, Evelius regarding Mr. Whittaker's relationship with Bit Reactor. *Id.* It was not strange to Evelius that Ms. Kelly was participating in those communications because she was employed by the Company in a senior management position. *Id.*

During those communications, Evelius was asked to prepare an agreement effecting or reflecting the termination of Whittaker's relationship with Bit Reactor. *Id.* ¶ 11. Evelius was aware that, while Whittaker's relationship with Bit Reactor was ending, Foertsch still

3

still wished to engage with Ms. Kelly in discussions and negotiations that would result in finalization and execution of the Draft Operating Agreement or a variant of it and finalization and execution of the Draft Employment Agreement or a variant of it. *Id.* Accordingly, Evelius determined that the agreement I prepared relative to the termination of Mr. Whittaker's relationship with Bit Reactor would need to address not only the termination of Mr. Whittaker's employment with Bit Reactor, but also any possible claim by Mr. Whittaker to ownership in Bit Reactor. In the latter regard, while I knew that the Draft Operating Agreement had never been signed, I still did not want Mr. Whittaker, after entering into an agreement reflecting the termination of his employment with Bit Reactor, to "show up" later claiming an ownership interest in the Company. *Id.*

On March 18, 2022, Evelius sent Foertsch and Kelly a draft Severance Agreement relating to Whittaker (the "**Draft TW Severance Agreement**"). *Id.* ¶ 12. On or about the same day, the draft TW Severance Agreement was sent to Whittaker. *Id.*

Evelius' purpose in preparing the Draft TW Severance Agreement was to address/effect the termination of Mr. Whittaker's relationship with Bit Reactor. *Id.* ¶ 13. Evelius included within the Draft TW Severance Agreement language by which Mr. Whittaker would release Bit Reactor, Mr. Foertsch, Ms. Kelly, and all other Bit Reactor employees from any claims relating to his employment with Bit Reactor and any claims relating to ownership in the Company. *Id.* To the best of Evelius' recollection, he specifically named Mr. Foertsch and Ms. Kelly as "releasees" of that release language for the following two reasons (marked "**A**" and "**B**"):

    A.    In preparing severance agreements on behalf of corporate clients, Evelius will typically specifically name any individuals with whom the departing employee

has had material contact during the latter's employment as releasees of the release provided by the departing employee, even though simply naming the Company and "all of its employees" would legally suffice. *Id.*

B. If the release provided by Mr. Whittaker were to release only Bit Reactor, but not Mr. Foertsch and Ms. Kelly, of any claims to Bit Reactor ownership, and Mr. Foertsch and Ms. Kelly thereafter were to enter into a finalized version of the Draft Operating Agreement, Mr. Whittaker could conceivably re-appear—days, months, or years "down the road"—to make a claim, against Mr. Foertsch and/or Ms. Kelly, for some portion of whatever Bit Reactor interest they then might own. *Id.* Evelius' view was that if he failed to include in the Draft TW Severance Agreement language by which Mr. Whittaker released Bit Reactor, but not Mr. Foertsch and Ms. Kelly, of claims to Bit Reactor ownership, he would be allowing for the possibility (*i.e.*, effectively creating the risk) that the Whittaker re-appearance scenario described in the immediately preceding sentence would developing in the future and thus neglecting Mr. Foertsch's continuing desire to negotiate, finalize, and enter with Ms. Kelly into an agreement under which the two of them would be co-owners of Bit Reactor—without any cloud on their title. *Id.*

On approximately April 20, 2022, Ezra Gollogly, Esquire, an attorney at the law firm of Kramon & Graham, contacted Evelius on behalf of Whittaker and communications between Gollogly and Evelius ensued concerning, among other things, the Draft TW Severance Agreement. *Id.* ¶ 14. During those communications, Mr. Gollogly contended, on behalf of Mr. Whittaker, that Mr. Whittaker owned a one-third (1/3) interest in Bit Reactor—even though the Draft Operating Agreement had not been finalized or signed—and that therefore Bit Reactor should, if it wanted a release of any claim of Mr. Whittaker to Bit

Reactor ownership, be willing to pay Mr. Whittaker substantially more money than that the dollar amount referenced as severance pay in the Draft TW Severance Agreement. *Id.* Those communications culminated in the execution, in late 2023, of the Settlement Agreement And Release attached as Exhibit 6 to the memorandum which Ms. Kelly has filed in support of her Motion to Disqualify (said Settlement Agreement And Release, the "**Finalized TW Settlement Agreement**"). *Id.* (Note that, during that time frame, there were large blocks of time when communications between Mr. Gollogly and me were "dormant.") *Id.*

Kelly never, during the period from early 2022 until execution of the Finalized TW Settlement Agreement, or at any other time, asked Evelius to represent her personally relative to Whittaker, Bit Reactor, Foertsch, or any other matter. *Id.* ¶ 15. Evelius never agreed to represent Ms. Kelly in her individual capacity. *Id.* The terms of the severance agreement may have benefitted Kelly, but any such benefit would have been, was, and is a byproduct of Evelius's competent representation of Bit Reactor and Foertsch. *Id.*

During the period from mid-2021 (at the latest) to late 2023, which period covers the entirety of the period from when Mr. Gollogly contacted me on behalf of Mr. Whittaker to the date when the Finalized TW Settlement Agreement was reached, Ms. Kelly was represented by an attorney, Matthew O'Keefe, Esquire with respect to the Draft Operating Agreement and Draft Employment Agreement, which, as discussed previously, had not been (and have never been) finalized. *Id.* ¶ 16.

On May 24, 2022, Kelly sent Evelius an email which stated:

> Hi Paul,
>
> I hope you are feeling better.
>
> Since we are moving forward with setting up agreements between Greg and myself.... Attached are my attorney's comments from the agreement.

6

> However, these also had Tom[] [Whittaker's] crazy changes. I thought it would be best for you to see my attorney's original notes and then craft a fresh set of documents.

*Id.* ¶ 17.

Attached to Kelly's May 24, 2022 email to Evelius was an email folder which contained an email, dated July 16, 2021, from Matthew O'Keefe, Esquire to Kelly, which stated:

> Alison
>
> I am attaching blackline copies of the revised documents as well as my handwritten changes. Please call me if you have any questions.
>
> Matt

*Id.* ¶ 18. (Attached to Mr. O'Keefe's July 16, 2021 email to Kelly were the Draft Operating Agreement and the Draft Employment Agreement that Evelius sent to Foertsch on April 27, 2021 (and which had been sent to Kelly), with handwritten and redlined changes. *Id.* ¶ 19.)

On June 10, 2022, Evelius sent Kelly an email which stated (bracketed language added for clarity):

> Hi Alison—
>
> On the TW front, I'm still awaiting Ezra Gollogly's written explanation of why TW thinks he owns an interest. When I talked to Ezra last week, he said that he would provide such an explanation. The only substantive thing he offered during our call was that (and I'm paraphrasing) he didn't "see how these guys with their history," and who had "left jobs" to "go after this $50MM deal and "worked weekends," would not have had an agreement that they were co-owners. I purposely did not challenge him on these statements, because I didn't want him to retract his statement that he'd provide a written statement of TW's position.
>
> As to the [Operating and Employment] Agreements, I think I understand the changes substantively and will be in touch Monday with a proposed plan for getting the Agreements to finality. I need to remember that it's not really appropriate for me to talk directly

7

> with you about the substance of the documents without your attorney's involvement. (Ethical rules.) So, while I haven't decided for sure, I may propose a zoom or phone call involving your lawyers. Hope this makes sense.
>
> Thanks!
>
> Paul

Id. ¶ 20.

On June 13, 2022, Evelius sent Kelly and Foertsch an email which stated:

> Hi Alison, Greg—
>
>> Just tried each of you by cell. Anyway, I wanted to follow up my email of Friday regarding the operating and employment agreements. I think the next steps, given that I represent the company and that Alison is represented separately, would be for Greg and me to discuss the various comments/changes that Alison's counsel has made and, once that conversation has happened, for us to arrange a call or other communication that would involve Alison and her counsel to move toward finalization. Alison, as I mentioned, I have to be cognizant of the fact that it's technically unethical for me to talk directly with you about the substance of the agreements without your lawyer either being present or giving his/her authorization. Greg, if you've had a chance to review everything, would you be available to talk with me about the agreements either tomorrow afternoon or sometime Wednesday? Thanks! Also, nothing yet from TW's lawyers. Paul

*Id.* ¶ 21.

On June 27, 2022, Kelly sent Evelius and O'Keefe an email which stated:

> Hi Paul,
>
> Below is Matt[] [O'Keefe's] contact info.
>
> Matt: Just to bring you up to date. Paul has your changes and is going to give you a quick call to get you up to speed. Tom resigned and the company is going to be Greg 51% and myself 49%. Give me a call (415-466-5103) once you have talked with Paul.

Id. ¶ 22.

On December 6, 2023, Mr. O'Keefe sent Evelius with a marked-up Draft Operating Agreement. *Id.* ¶ 23. Evelius also had several other communications with Mr. O'Keefe. *Id.* ¶ 24.

**LEGAL STANDARD**

Motions to disqualify counsel "are disfavored and are permitted only where the conflict is such as clearly to call into question the fair and efficient administration of justice" *Dorsey v. Sokoloff*, 381 F.Supp.3d 521 (2019)(*quoting Gross v. SES American, Inc.*, 307 F. Supp. 2d 719 (D. Md. 2004)). Disqualification is a "drastic remedy" that "deprives litigants of their right to freely choose their own counsel." *Gross*, 307 F. Supp. 2d at 722-23.

The Maryland Rules of Professional Conduct "expressly caution that motions to disqualify 'should be viewed with caution… for [they] can be misused as a technique for harassment.'" *Id.* at 722-23. For these reasons, "disqualification at the urging of opposing counsel is permitted only "[w]here the conflict is such as clearly to call in question the fair and efficient administration of justice." *Id.* at 723. A party seeking disqualification "bear[s] 'a high standard of proof to show that disqualification is warranted.'" *Franklin v. Clark*, 454 F. Supp. 2d 356, 365 (D. Md. 2006).

A motion to disqualify is governed by federal common law informed by the applicable rules of professional conduct. Contrary to Plaintiff's assertions, "the motion is not literally brought 'pursuant' to or 'under' those rules." Rather, motions to disqualify counsel invoke the inherent power of courts to control the proceedings (and the lawyers) before them…" *Lloyd v. Baltimore Police Dep't*, Civ. No. ABA-23-1987, 2024 WL 1465700 at *2 (D. Md. April 4, 2024).

*Id.* ¶ 22.

A purported former client's motion to disqualify cannot be granted unless (1) the moving party establishes that an attorney-client relationship existed with the alleged former client. *Stratagene v. Invitrogen Corp.*, 225 F.Supp.2d 608 (2002)(*citing SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 141 F. Supp.2d 616, 621 (W.D.N.C. 2001)). If follows that Kelly must demonstrate that Defense Counsel at one time had an attorney client relationship with her.

## ARGUMENT

### I. Kelly never had an attorney-client relationship with Evelius.

Kelly has failed to adduce any evidence that she ever had an attorney-client relationship with Defense Counsel or even that she asked Defense Counsel to represent her personally. Evelius, on the other hand, has affied that Defense Counsel never had an attorney-client relationship with Kelly and that Kelly never asked Defense Counsel to represent her personally. Further, Defense Counsel has produced evidence that, throughout the time when Kelly claims that Defense Counsel were representing her, she was represented by Mr. O'Keefe. Under these circumstances, Kelly cannot viably claim that Defense Counsel ever represented her. *See Attorney Grievance Com'm v. Shoup*, 410 Md. 462 (2009); *United States v. Drake*, 310 F. Supp. 3d 607 (2018).

This is precisely the situation under which motions to disqualify are disfavored by courts. *U.S. for Use and Benefit of Union Light and Power Co. v. CamCo Constr. Co., Inc.*, 221 F. Supp. 2d 630 (2002); *In re Legacy Development SC Group, LLC*, 517 B.R. 604 (2014)(courts must always remain mindful of the opposing possibility of misuse of

disqualification motions for strategic reasons.) *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145–46 (4th Cir.1992). Plaintiff bears the high burden and has not met it. *Jarallah v. Thompson*, 123 F.Supp. 3d 719 (2015)(a movant seeking disqualification of a party's counsel has the burden of proof as to all facts necessary to show the rule of professional conduct that requires the attorney's disqualification).

## II. The fact that Defense Counsel's representation of Bit Reactor and Foertsch may have benefitted Kelly did not create an attorney-client relationship between Defense Counsel and Kelly.

Under well-established case law, the fact that Defense Counsel's representation of Bit Reactor and Foertsch may have benefitted Kelly did not create an attorney-client relationship between Defense Counsel and Kelly. *See Glesner v. Miles & Stockbridge, P.C.*, 2018 WL 1391616 (App. Ct. Md. 2018), *cert denied*, 460 Md. 13 (2018); *Monco v. Zoltek Corp.*, 397 F. Supp. 3d 1165, 1172 (N.D. Ill. 2019)

## III. Evelius is not a necessary witness at trial.

Plaintiff further seeks disqualification of undersigned counsel by alleging counsel would be a necessary witness at trial.

Maryland Rule 19-303.7 (Attorney As Witness) provides:

> (a) An attorney shall not act as advocate at a trial in which the attorney is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
> (3) disqualification of the attorney would work substantial hardship on the client
>
> (b) An attorney may act as advocate in a trial in which another attorney in the attorney's firm is likely to be called as a witness unless precluded from doing so by Rule 19-301.7 (1.7) or Rule 19-301.9 (1.9).

11

Such a motion by the opposing party is, again, profoundly disfavored. In *Klupt v. Krongard*, 126 Md. App. 179 (1999), cited by Plaintiff, the Court stated:

> When an opposing party moves for disqualification of the other party's counsel, the court will take a hard look at such a motion. The concern is that the opposing party will use such a motion to block, harass, or otherwise hinder the other party's case. Such "tactical abuse" of the disqualification process is to be guarded against. *See* ABA, *Annotated Model Rules of Professional Conduct* 359 (3d ed.1996) (annotations to Rule 3.7) (citing *Paramount Communications Inc. v. Donaghy*, 858 F.Supp. 391 (S.D.N.Y.1994); *Kalmanovitz v. G. Heileman Brewing Co.*, 610 F.Supp. 1319 (D.Del.1985); *Devins v. Peitzer*, 622 So.2d 558 (Fla.Dist.Ct.App.1993); *May v. Crofts*, 868 S.W.2d 397 (Tex.Ct.App.1993)).
>
> To that end, as the appellants rightly note, courts closely scrutinize such disqualification motions.
>
> Among the factors courts have adopted when deciding motions for disqualification are the materiality of the advocate-witness's evidence; the exclusivity of the advocate-witness as the source of the evidence; and the prejudice to the advocate-witness's client. *See, e.g., LeaseAmerica Corp. v. Stewart*, 19 Kan.App.2d 740, 876 P.2d 184, 192 (1994); *Smithson v. USF & G Co.*, 186 W.Va. 195, 411 S.E.2d 850, 856 (1991).

In *Klupt*, disqualification was warranted because the attorney accepted employment *by* the defendants and already knew the necessity of the attorney being a witness *against* defendants. None of these factors are implicated in the instant matter where undersigned counsel has represented Bit Reactor for several years, continues to represent Bit Reactor, and is not a witness much less a necessary one against Bit Reactor.

Plaintiff in the instant action never even alleges – because she knows she cannot – that undersigned counsel is a *necessary* witness as required by the Rule. Even if Evelius heard conversations between phone conversations and communications between Kelly and Foertsch, it does not make him a necessary witness. The communications between Kelly and

Foertsch speak for themselves. The hearsay content of long ago phone conversations is a tenuous, at best, reed at which Plaintiff grasps. Evelius, by Plaintiff's own contention, is not the exclusive source for *any* evidence. He has no personal knowledge of the crucial initial conversations between Plaintiff and Defendant Foertsch when they allegedly conceived the idea for Bit Reactor or subsequent ownership conversations. These are the "central issue[s] in the case," not subsequent conversations about legal documents to corporate counsel. *Franklin v. Clark*, 454 F.Supp.2d 356 (2006).

The Maryland Rules make clear that "the tribunal has a proper objection when the trier of fact may be confused or misled by an attorney serving as both advocate and witness." *See* Rule 19.303.7, Comment 3. In this case, Plaintiff has not requested a jury trial and, therefore, must carry the burden of showing that this Court would be confused or misled in the unlikely event that Evelius would be called as a witness at trial. *Mills v. Hausmann-McNally, S.C*, 992 F.Supp.2d 885 (2014)(holding that a moving party bears the burden of concretely establishing the necessity of disqualification); *See also Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).

Other courts have found that there is *no* risk of confusion when a court acts as the finder of fact. *Cramton v. Grabbagreen Franchising, LLC*, 2020 WL 6680366 (2020)(*citing Shore v. Mohave County*, 644 F.2d 1320(9th Cir 1981("Since this was a bench trial, there was little danger under the circumstances that the court would have been unduly impressed by the expert's testimony or option); *Crowe v. Smith*, 151 F.3d 217, 233-34 (5th Cir. 1998)("[A]s numerous courts and commentators have recognized, the only justification for the attorney testimony rule that might be viewed as affecting the rights of the opposing party is that derived from the fear that the jury will either accord such testimony undue weight, or will be unable

to distinguish between the attorney's testimony, offered under oath, and his legal argument, offered in rhetorical support of his client's case. As a majority of these courts have also recognized, this justification is inapplicable where, as here, the testimony is made to a judge, not a jury.")

Plaintiff's alleged notice to Evelius of his role in this case comes at the hand of her counsel under precisely the circumstances roundly questioned by courts. Evelius has no exclusive information material to the factual matters at hand and Plaintiff's motion to disqualify on this basis does not withstand the "close scrutiny" that must be applied. *Klupt, 126* Md. App at 207. Evelius's disqualification would work a substantial hardship on Bit Reactor and Foertsch, longtime clients, and deprive them of the counsel of their choice.

This motion must be treated with the legally required "skepticism" and concern "about the possibility that the motion to disqualify is an abusive tactic." *Harter v. Univ. of Indianapolis*, 5 F.Supp.2d 657 (S.D. Ind. 1998).

## CONCLUSION

Defendants respectfully submit that the Motion to Disqualify should be denied.

Respectfully Submitted,

                         */s/ Paul F. Evelius*
Paul F. Evelius (Bar #05754)
Wright, Constable & Skeen, LLP
1 Olympic Place, Suite 800
Towson, Maryland 21204
(410) 659-1302 - Telephone
(410) 659-1350 - Facsimile
pevelius@wcslaw.com
*Counsel for Defendants*

## *CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that on this 17th day of September, 2024, the foregoing memorandum was served by CM/ECF upon all counsel of record.

*/s/ Paul F. Evelius*
Paul F. Evelius
*Counsel for Defendants*
